IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KEVIN S. WETMORE,

        Plaintiff,

        v.                              Civil Action No. 5:09-CV-38

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I. Introduction**

A.     <u>Background</u>

     Plaintiff, Kevin Wetmore (Claimant), filed a Complaint on April 7, 2009, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on June 8,

2009.[2]  Claimant filed her Motion for Summary Judgment on July 13, 2009.[3]  Commissioner

filed his Motion for Summary Judgment on July 27, 2009.[4]  Plaintiff filed a Reply to

Commissioner's Motion for Summary Judgment on August 10, 2009.[5]

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 9.

[4] Docket No. 11.

[5] Docket No. 13.

B.	The Pleadings

    1.	Plaintiff's Brief in Support of Motion for Summary Judgment.

    2.	Defendant's Brief in Support of Motion for Summary Judgment.

    3.	Plaintiff's Reply Brief.

C.	Recommendation

I recommend that:

    1.	Claimant's Motion for Summary Judgment be **DENIED** because there was substantial evidence supporting the ALJ's decision to find Claimant did not have an impairment or combination of impairments that meets or medically equals one of the Listings and to discredit Claimant's testimony.

    2.	Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II.  Facts

A.	Procedural History

Claimant filed an application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on February 2, 2007, alleging disability since December 1, 2006, due to a back injury.  (Tr. 125-31, 151-52).  The claim was denied initially on March 9, 2007, and upon reconsideration on March 28, 2007.  (Tr. 88, 99).  Claimant filed a written request for a hearing on May 3, 2007.  (Tr. 105).  Claimant's request was granted, and a hearing was held on June 5, 2008, (Tr. 21-83).

The ALJ issued an unfavorable decision on June 29, 2008.  (Tr. 9-20).  The ALJ determined Claimant was not disabled under the Act because Claimant had the residual

functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). (Tr. 15). On October 3, 2008, Claimant filed a request for review of that determination. (Tr. 5-8). The request for review was denied by the Appeals Council on February 25, 2009. (Tr. 1-3). Therefore, on February 25, 2009, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.  Personal History

Claimant was born on October 3, 1961, and was forty-five (45) years old as of the onset date of his alleged disability and forty-six (46) as of the date of the ALJ's decision. (Tr. 34). Claimant was therefore considered a "younger person," under the age of 50 and, generally, whose age will not seriously affect the ability to adjust to other work, under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009). Claimant graduated from high school, received a nursing assistant certificate, and worked as a nurse assistant from 1999 to 2006. (Tr. 34). Claimant also worked at Vision Automotive for 15 years as a sales person and later a parts manager. (Tr. 35).

C.  Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**Vocational Analysis, Marjorie Garcia, 3/28/07 (Tr. 185)**
Physical Assessment:
•        exertional level: light
•        restrictions: postural

Previous Transferable Skills: not material
Claimant cannot perform past work as described.
Claimant can perform past work as described in the national economy.
Remarks: Claimant remains capable of performing his past work as an auto parts salesperson as it is described in the national economy.

**Physical Residual Functional Capacity Assessment, Jim King, 3/8/07 (Tr. 197-204)**
Exertional Limitations:
• occasionally lift: 20 pounds
• frequently lift: 10 pounds
• stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
• sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
• push and/or pull: unlimited
Postural Limitations:
• climbing - ramp/stairs: occasionally
• climbing - ladder/rope/scaffolds: never
• balancing: occasionally
• stooping: occasionally
• kneeling: occasionally
• crouching: occasionally
• crawling: occasionally
Manipulative Limitations: none
Visual Limitations: none
Communicative Limitations: none
Environmental Limitations:
• extreme cold: avoid concentrated exposure
• extreme heat: avoid concentrated exposure
• wetness: unlimited
• humidity: unlimited
• noise: unlimited
• vibration: avoid concentrated exposure
• fumes, odors, dusts, gases, poor ventilation: unlimited
• hazards: avoid concentrated exposure
Comments: morbidly obese; medical records indicate presence of lumbar disc disease with C/o pain in his back and legs. Despite allegation of back pain, he does not take any Rx pain meds; uses ibuprofen. Diabetes is in poor control. Claimant's allegations are partially credible, in that his medical records confirm the presence of his alleged conditions but they do not support the degree of limitations alleged by the claimant. Sedentary lifestyle; independent in personal care; able to walk about 500 ft at a time/ drives. Light RFC.

**Belington Clinic, 12/1/06 (Tr. 209)**
Chief Complaint: lower back pain
Diagnosis: lumbar strain
Management: (illegible); robaxin; rest

**Belington Clinic, 8/6/07 (Tr. 247)**
Chief Complaint: back pain
notes: morbidly obese
Diagnosis: LBP 2 degrees/ spinal stenosis
Management: trial ultram ER 200 (#8); muscle relaxer
Patient will need pain management; recommend to continue Corat or other Rx (consider referral)

**St. Joseph's Hospital of Buckhannon, John Henderson, 12/15/06 (Tr. 216)**
- lumbar spine is well aligned; degenerative disc change seem from L2-3 through L4-5 with disc desiccation and disc space narrowing
- broad-based disc bulge at L2-3 level with moderate impingement of sac
- small right paracentral focal disc herniation
- broad-based disc bulge at L3-4 with mild impingement
- Impression: tiny focal herniation L2-3 causing some impingement of the sac. Moderate spinal stenosis at this level

**United Hospital Center, James Weinstein, 2/6/07 (Tr. 217-19)**
- no more focal anterior extradural impress and stenosis at L2-L3 level
- large osteophytes greater on left side at 2-3 level and moderate narrowing of the disc space
- asymmetric lateral encroachment on right side at 4-5
- L1-L2 mild annular bulge with no significant impress or stenosis
- L2-L3: diffuse annular impress
- L3-L4: mild degree of spinal stenosis with diffuse annular disc bulge/protrusion and mild lower foraminal encroachment
- L4-L5: diffuse annular disc protrusion or possibly minimal herniation with bilateral foraminal encroachment; relative spinal stenosis
- L5-S1: no significant stenosis or definite neural encroachment
- Impression: most significant finding appears to be severe spinal stenosis at L2-L3. Mild relative spinal stenosis L3-L4 and 4-5 slight asymmetric

**Associated Specialists, Inc., Letter to Dr. Henderson from Dr. Weinstein, 2/12/07 (Tr. 220)**
definite stenosis at 2-3 level
will need surgery sooner or later; would like for him to be under 300 pounds before operation

**Associated Specialists, Inc., Letter to Claimant from Dr. Weinstein, 2/12/07 (Tr. 221)**
severe lumbar stenosis at 2-3 level
significant pressure on spinal nerve roots and produces the lumbar syndrome
reluctant to do surgery because of weight
move to light duty at work

**Associated Specialists, Inc., Letter to Dr. Henderson from Dr. Weinstein, 1/18/07 (Tr. 222)**
reflexes are absent due to diabetes
straight leg raising is positive bilaterally at about 60 degrees

appears to be some stenosis at 2-3 level
concerned about risks of operating on someone Claimant's size

**Progress Notes, John Henderson, M.D., 4/19/07-7/11/07 (Tr. 224, 246, 248-50, 253-55, 260)**
- 4/19/07
  - subjective: back problems; weight 370 pounds; illegible
  - objective: illegible
  - a: illegible
  - plan: illegible
- 6/1/07
  - S: 45m c/o back problems; illegible; weight 370 pounds
  - O: illegible
  - A: 1 DDM 2; illegible
  - P: illegible
- 7/5/07
  - S: 45 m back no better; pain in mid-low back
  - O: illegible
  - A: 1DDM 2; lumbar disc
  - P: illegible
- 7/11/07
  - recommendation: should have pain management treat or recommend for long-term
- 8/9/07
  - chief complaint: NID DM
  - S: has been noticing elevated blood sugar; has restarted insulin
  - O: illegible
  - AP: type II DM; continue insulin; illegible
- 8/10/07
  - S: bilateral foot tenderness
  - O: illegible
  - A: illegible
  - P: illegible
- 9/21/07
  - S: 45m; routine; DM2; illegible
  - O: illegible
  - A: DM 2; lumbar disc
  - P: illegible
- 1/18/08
  - S: 348 pounds; 46m back pain; burning and numbing sensation in feet
  - O: illegible
  - A: illegible
  - P: illegible
- 1/25/08
  - S: 46m; illegible

- O: 46m
  - A: 1DM2; spinal stenosis
  - P: illegible
- 5/27/08
  - S: 46m; routine check; wants to consider gastric bypass; no headache or dizziness; back pain
  - O: 46m; illegible
  - A: 1 DDM 2; spinal stenosis
  - P: illegible

**Davis Memorial Hospital, Matt Lambert, M.D., 12/6/06 (Tr. 238)**
- reason for exam: back pain/ injury
- full result: back injury - AP, lateral, oblique and sacral views of the lumbar spine were obtained.  Normal alignment with no loss of vertebral body height.  Mild disc space narrowing at L2-3 present with osteophytes at L2-3 seen anteriorly.  Soft tissues appear normal.
- Impression: degenerative disc changes at L2-3.  No acute process identified of the lumbar spine.

D.  Testimonial Evidence

Testimony was taken at the hearing held on March 21, 2007.  The following portions of

the testimony are relevant to the disposition of the case:

| | |
|---|---|
| Q | Okay.  How did you get here today? |
| A | I drove. |
| Q | Were you able to drive without stopping? |
| A | No. |
| Q | How long did you drive before you stopped? |
| A | Halfway here I got up - - 25 miles. |
| Q | And how long did that take you? |
| A | A half-hour. |
| Q | Why did you stop? |
| A | I had to get out and stretch my back.  It started - - legs were going numb. |
| Q | What was your condition when you arrived here today? |
| A | The same.  I had to get out and walk around a little. |

              *             *             *

| | |
|---|---|
| Q | Graduate high school? |
| A | Yes. |
| Q | Did you have any school after high school? |
| A | I went to Potomac Highlands Prep School for CNA, certified nursing assistant. |
| Q | Did you get your certificate? |
| A | Yes, I did. |

Q        Did you work in that field?

A        Yes, I did.

Q        How long?

A        From 1999 to 2006 or 7.

Q        Why did you stop?

A        Because of my lower back pain.

Q        Did the lower back pain come on all at once or was it gradual?

A        It was gradual.

Q        Now did you work anywhere else before you worked as a CNA?

A        Yes.

Q        Where did you work?

A        I worked at Vision Automotive in Elkins, West Virginia.

Q        And what was your job?

A        I was a parts manager and sales person for parts department.

Q        How long were you the parts manager?

A        Manager about two years.

Q        Okay, now in that job what was the heaviest thing you had to lift on a regular basis?

A        Transmissions, motors.

Q        100 pounds or more?

A        Oh, yeah, easy.

Q        When you went to parts manager, did you still have to wait on customers?

A        Yes, sir.

Q        In the parts department, could you wait on a customer from a seated position?

A        No, not really.  You can't greet someone sitting down like that.

*         *         *

BY ATTORNEY:

Q        That job was done primarily on your feet?

A        Yes, sir.

Q        You still worked the counter after you were a parts manager?

A        Yes, sir.

Q        Did you make out schedules as a parts manager?

A        Yes, I did.

Q        Did you have the authority to hire and fire?

A        No, I could make recommendations, but the owner eventually had the final say.

Q        How was your job different when you became a parts manager as opposed to being just a salesperson?

A        I took on a lot more responsibility for two other, three other people that was working under me, and more paperwork.

Q        What kind of paperwork were you doing?

A        Invoicing sales, receipts, income, you know, everything.

Q        Did you have to do monthly reports about how much business - -

A        Yes.

Q        - - you did?

A     Yes.

Q     Did you train new employees?

A     Yes.

Q     Why did you leave that job?

A     Well, I couldn't no longer stand very long in the daytime was one of the reasons, and the other reason was, I started taking care of my grandfather at home - -

Q     Um-hum.

A     - - that was sick, and I decided I liked that pretty well, so I got out of it.  I got out of what I was doing.  It became a big headache for me also.  As being a boss I had, you know, three people I had to work under me and I just didn't want the responsibility at that time.

Q     Now I probably messed up your chronology here - - you said you kind of liked taking care of your grandfather so you got out of parts manager.  What did you do - - did your grandfather eventually die?

A     Yes, my grandfather did die.  I took care of him until he passed away, and then I went to CNA school.

Q     Okay, all right.  So when did you leave the parts department?

A     Memorial Day weekend 1999.  I know it from a fact.

                    *            *                *

Q     Was yesterday a pretty typical day for you?

A     Yeah.

Q     Let's talk about yesterday.  What time did you get up?

A     I get up about 6:15.

Q     What do you do first thing in the morning?

A     Go directly to the kitchen for my pills because of back pain.

Q     What is your condition like when you first wake up?

A     Very stiff.

Q     In your low back?

A     Oh, yeah.

Q     What pills do you take first thing in the morning?

A     Tramadol.  Then I take my - - well, I take my Tramadol and then I'll wait about a half an hour after that, then I'll take my insulin and my regular sugar medications.

Q     Now do you normally eat breakfast?

A     Sometimes I eat couple pieces of toast.  Sometimes I don't eat anything.

Q     Okay, you check your blood sugar every day?

A     Every morning and every evening.

Q     What does it normally run?

A     Oh, it's anywhere from 130 - - in the thirties to the nineties.

Q     130 to 190?

A     Yeah, 130's to 190's.

Q     Where would your doctor like it to be?

A     124 or below.

Q     Do you take your insulin in response to what your blood sugar reading is?

A     No.

Q     You take two insulin injections every day regardless of your blood sugar level?

A       Correct.

Q       Have you ever had episodes of low blood sugar?

A       Yes, I have.

Q       How low has it gotten?

A       It has gotten in the low thirties before.

Q       Okay, do you remember how long it's been since that was a problem?

A       Oh, it's been at least six months since that's happened.

Q       And when you were in that state, how did you feel?

A       Shaky, sluggish, just have no power, no, you know, unrest.

Q       And what did you do about it?

A       Eat something sweet.

Q       Do you know when your blood sugar is way too high?

A       I have a pretty good idea, yes.

Q       How do you feel?

A       Again, shaky.  The way I really know is when I go to test my blood, when I stick myself, the blood comes to the top immediately.

Q       Um-hum.

A       Otherwise I have to kind of milk it out.

Q       Okay.

A       That's how I really know it - - you know, before I get the test done.

Q       If you give yourself an insulin injection that takes care of the shakiness?

A       Yeah, sometimes.

Q       Going back to your daily activities, do you have a dishwasher at your house?

A       No.

Q       So there are dishes to be washed?

A       Yes.

Q       Do you do the dishes at the house?

A       Yes.

Q       How often during the day do you wash the dishes?

A       Once a day.

Q       How long's it take?

A       5-10 minutes.

Q       Is that all the dishes for the day?

A       Oh, yeah.

Q       Do you - - can you do it all without a break?

A       The dishes, yes.

Q       Okay.  Let's talk about the other household chores.  Do you have anybody helping you with any of your household chores?

A       Yes, my girlfriend comes and helps me.

Q       How often does she come?

A       Three days a week for sure.

Q       And what does she do?

A       She sweeps.  She does my laundry, makes my beds, just typical housework, dust.

Q       You said she makes your beds.

| | |
|---|---|
| A | Um-hum. |
| Q | You live alone. |
| A | Well, my bed. |
| Q | Okay. |
| A | Pardon me. |
| Q | All right.  I just want to make it clear. |
| A | I do have two beds though. |
| Q | Why does she do the laundry rather than you do it? |
| A | Well, I can't stand to lift and bend that much. |
| Q | How about making the beds?  What part of making the bed is a problem for you? |
| A | I can't stoop over to pull the sheets. |
| Q | If you do make a stooping motion with your back, what happens? |
| A | Pain, sharp pain. |
| Q | Who does the grocery shopping at your house? |
| A | I do. |
| Q | How often do you go? |
| A | Oh, once a week maybe. |
| Q | How long are you in the store? |
| A | 10-15 minutes max. |
| Q | Do you ever have to leave the store before you've gotten everything? |
| A | Yes, I do. |
| Q | Why? |
| A | To sit down and rest because there's no where to rest at the store. |
| Q | And what makes you sit down and rest? |
| A | Numbness in my legs and in my lower back. |
| Q | How often do you have to take a break from grocery shopping because of that sensation? |
| A | Usually not very often because I don't stay long enough to - - I know when I have to leave, so I leave. |
| Q | Okay.  So you're saying 15 minutes is the longest you can last in the store? |
| A | Yeah, I would say. |
| Q | Do you normally fix yourself lunch? |
| A | Yeah. |
| Q | What do you normally fix? |
| A | Sandwich, something fast. |
| Q | Do you cook a big meal at dinner? |
| A | No. |
| Q | What do you usually make? |
| A | About the same thing usually, a sandwich or something quick. |
| Q | All right.  Now your main doctor is at the Belington Clinic? |
| A | Correct. |
| Q | How often do you see someone at the Belington Clinic? |
| A | Every three months. |
| Q | Who is your doctor there now? |

A      Well, he's a PA doctor, Tom Howard. He works under, I would say it would be Jeff Harris or John Henderson, I think are the practicing doctors there.

Q      Okay. Henderson and Harris are M.D.'s.

A      Right.

Q      And you mostly see - -

A      Tom Howard.

Q      - - Tom Howard who's a PA, physician's - -

A      Right.

Q      - - assistant. All right. Have they ever talked to you about getting on some kind of diet to lose weight?

A      Yes.

Q      When?

A      It's been - - I saw a dietician at least 10 years ago - -

Q      Um-hum.

A      - - because I found out I had diabetes when I was 32, and I went right then and I did lose some weight then. Of course, I was able to exercise and do some, you know, other things.

Q      Now, how much did you weigh when you went to see Dr. Weinstein about your back?

A      About 370.

Q      Okay. Do you know what you weigh now?

A      If I'm correct, it's 350 or 340-some, right in that area.

Q      Okay. Have you lost lower than 350 since you saw Dr. Weinstein?

A      No.

Q      You haven't been below 340?

A      I might have been 320, but I'm not sure. I can't recall.

Q      Now in his letter, Dr. Weinstein suggested you have some kind of stomach surgery. I'm trying to look to see what exactly he calls it - - stomach operation is all he calls it - - have you looked into that?

A      Yes, I have.

Q      What have you looked into?

A      I looked into the Lap Band System and I had all the information sent to my house and they wanted $15,000 to do it, which I could not - -

Q      You don't have any insurance?

A      No.

Q      Can you get health insurance through Unim (Phonetic) or is just disability?

A      Just disability.

Q      Okay. You have back - - pain in your low back?

A      Yes, sir.

Q      Whereabouts is it located?

A      Right at the belt line and below.

Q      What does it feel like?

A      Most of the time, more or less all the time it feels like there's a dull, dull pain like a knee in your back. And then whenever I overexert myself, bend too far or for too long, it gets

sharp.

Q        Does the pain ever move to another part of your body?

A        Just my legs.

Q        Both legs?

A        Yeah, and they burn.  Then they go numb.

Q        What parts of your legs are affected?

A        The right, right thigh inside is the main one.  The left one will go numb after a while.

Q        What kind of activity causes that sharp pain to come on?

A        Bending and pulling.

Q        Pulling on something?

A        Right.

Q        Okay.  Does it have to be something heavy?

A        Not all the time, no.

Q        Can you lift a gallon of milk?

A        Yes.

Q        Does it cause you any kind of discomfort?

A        No, not that I know of.

Q        Can you carry a gallon of milk in both hands, one in each hand?

A        Yeah.

Q        Does that cause you any problems?

A        It would if I had to carry it very far.

Q        How about if you picked it up at the store, gallon in each hand, and you walk out of the store?

A        I could make that.

Q        All right.  when you get home with the groceries, do you have any help unloading the groceries?

A        Yes.

Q        Who helps you?

A        My girlfriend goes and does it.

Q        Do you arrange for her to be home when you get home?

A        Yes.

Q        Why?

A        For that reason, if I'm going to the store she usually goes with me.

Q        Okay.  Now you indicated that you have numbness in your legs.

A        Um-hum.

                    *                    *                    *

BY ATTORNEY:

Q        And, and quite frankly, strike the question.  He's already answered it, Your Honor.  I'm sorry.  Have you noticed that changes in temperature affect your back pain?

A        Yes, I have.

Q        What?

A        When it's raining and it's going to rain, I can pretty much tell you it's going to rain.

13

Q        Why?

A        Because I have sharp pains and inflammation in my legs and my hips.  That's why I take Naproxen then whenever it's coming on.

Q        Okay.  Now I know as you sit here today you're holding onto the corner of the table with your left hand and you have your right arm on the table.

A        Um-hum.

Q        Why is that?

A        Taking a little pressure off my back.

Q        Okay.  That's not how you sat at the beginning of the hearing?

A        No.

Q        Are you in discomfort now?

A        Yeah, a little bit.

Q        Okay.  Is there anything that you would normally do to make yourself more comfortable?

A        Stand.

Q        Do you want to do that now?

A        I'd like to.  Can I?

ALJ     You may.

                    *              *              *

Q        Now you've been sitting in this hearing room for about 40 minutes.  Is that your normal limit?

A        That's about it.

Q        Now how long will you need to stand before you have - - can go back to sitting?

A        Oh, I can stand just a few minutes and then get back, probably three to four minutes probably.

Q        Okay.

A        Just enough to take the pressure off.

Q        Would your duration of sitting be less the second time?

A        Probably not.

Q        So you can pretty much count on 30 to 40 minutes of sitting?

A        Yeah.

Q        How long can you stand before you have to change positions?

A        Oh, 10 minutes.

Q        And what happens to you after that?

A        Legs go numb.  They, they burn first, then they go numb.

Q        And what do you do to relieve that?

A        Sit usually.

Q        How long can - - do you have to sit before you can go back to standing?

A        Oh, 5-10 minutes maybe.

Q        Okay.  Is your duration of standing less the second time?

A        Not really.  It's about the same.

Q        All right.  Do you have any difficulty with walking?

A        Yes.

Q        How far can you walk before you have to take a break?

14

A       Oh, I'd say 100 yards.

Q       Okay. And what would be your condition after that?

A       My legs would be burning numb, have to sit again.

Q       For how long?

A       5-10 minutes probably.

Q       Okay, and would you be able to walk another 100 yards after 5 or 10 minutes?

A       Yes, probably.

Q       Okay. Now you indicated that the sharp pain comes when you bend.

A       Yes, sir.

Q       How far do you have to bend before that pain starts?

A       A quarter, quarter of the way, maybe.

Q       Okay. That causes you sharp pain?

A       Um-hum.

Q       When that happens, how long does the pain last?

A       Two or three minutes until I straighten back up.

ALJ       Counsel, I'm going to interrupt. There was a demonstration that not verbally on the record. Could you clarify, please?

ATTY       Yes, Your Honor, he said a quarter of the way. I would suggest he was probably at 30 degrees.

ALJ       Bending forward?

ATTY       Bending forward. That would be my estimation, Your Honor.

ALJ       Would you ask your client to see if he agrees?

BY ATTORNEY:

Q       Would you agree that 30 degrees? 90 is all the way - -

A       Yeah.

Q       - - would you agree with that?

A       Yes.

                *            *            *

Q       Do you still drive?

A       Yes, sir.

Q       Do you drive every day?

A       Yes, sir.

Q       Where do you go?

A       Well, I usually go to my grandmother's about a mile and a half away.

                *            *            *

Q       Okay. Do you provide her with any care like when you were a CNA?

A       No.

Q       Okay. Did you do that at one time?

A       Yes.

Q       When is the last time you provided her with any care services?

A       Oh, it's been, oh, it's been a few years since I've done anything for her.

Q       How long do you visit with your grandmother every day?

A       Oh, three or four hours maybe.

Q       Okay. Then you drive back home?

A      Right.

Q      How many miles in a week would you estimate you drive?

A      25 maybe.  It's only like a mile and a half over there and I go over and back, so 3 or 4 miles a day probably.

Q      Okay.  What time do you go to bed at night?

A      I like to go to bed about 11:00-11:15.

Q      Do you normally sleep through the night?

A      No.

Q      Well, how long do you lay in bed before you fall asleep usually?

A      Probably three hours.

Q      Now you're - - are you taking anything that's supposed to help you sleep?

A      Amitriptyline.

Q      Does it work?

A      Sometimes it does and sometimes it doesn't.

Q      How many hours of sleep do you think you get every night?

A      I'd say four to five.

Q      Now you take Flexeril and you take Tramadol.

A      Correct.

Q      Do those medicines cause you any side effects when you take them?

A      Drowsiness.

*         *         *

BY ATTORNEY:

Q      How long after you take - - well, let's take it one pill at a time.  How long after you take a Flexeril before you experience drowsiness?

A      Oh, half-hour, 45 minutes maybe.

Q      Okay, eventually fall asleep?

A      Not all the way asleep because I, I can't.  I just can't sleep.

Q      But you are drowsy?

A      Oh, yeah.

Q      How long do you stay that way?

A      Oh, a hour, two hours.

Q      How about the Tramadol, how long are you take it before you feel drowsy?

A      Oh, an hour or so probably.

Q      And how long do you feel that way?

A      Probably about the same, two or three hours.

Q      Okay.  When you've taken a Tramadol or a Flexeril, do you feel that you can still drive?

A      Yeah, yeah.

Q      Okay.  Now you've been on Elavil before and you're on Amitriptyline now.

A      Right.

Q      Did, did your PA tell you why they were giving you those pills?

A      Well, the PA didn't give me the Amitriptyline.  The doctor did, Dr. Harris did. He gave them to me that it would help me sleep at night.

Q      Okay.  All right.  Have you noticed any problems with your feet?

A      I do have problems with my feet. I have heel spurs on both of my feet.

Q      Okay, and does that affect your ability to stand?

A      Yes.

Q      And do you have any numbness or pins and needle sensation in your feet?

A      Not really, no.

Q      Okay. Have you told your doctors about the problems with your feet?

A      Yes, I have.

Q      Have they done anything?

A      Not a thing.

Q      Did you ever see a podiatrist?

A      Yes, I did.

Q      When?

A      Right after I first got my sugar, about 10 years ago I saw him, and he took x-rays of my feet and got the pictures of the spurs. He said I had - - since I had sugar diabetes he wouldn't, wouldn't - - couldn't take them off. Usually what they do is they cut the skin and grind them off. He said that they couldn't do that because they probably wouldn't heal.

Q      So you haven't been back to a podiatrist?

A      Right.

           *           *           *

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q      Thank you. When you and Dr. Weinstein were talking about your weight loss plan in February of 2007, you indicated you thought you were about 370 pounds at the time. I see you nodding your head, is that a yes?

A      Yes, ma'am.

Q      And you now weigh about 350?

A      Yes, ma'am.

Q      Did, did you follow the weight loss plan at all ?

A      Well, he really didn't give me one. I, I tried to self - - you know, I tried to do it by myself.

Q      So he just recommended that you lose weight - -

A      Correct.

Q      - - nothing else was said?

A      That's right.

Q      Your attorney provided a, a list of new medications in Exhibit 14E that have been prescribed for you from Belington Community Medical and they appear to all have started in January and February of 2008. Is - - something happen that resulted in your going to the medical clinic and asking for more medicines?

A      Yes, ma'am, I went to a meeting at my job with Mountain Hospice, and when the meeting adjourned, I couldn't - - I stood up and that's all I could do. I couldn't bend or anything, so they sent me to the clinic.

           *           *           *

BY ADMINISTRATIVE LAW JUDGE:

Q      My question - - maybe I should start with a question about employment. You indicated that you had stopped your employment as a certified nurse's assistant in January of

'07.

A       Yes, ma'am.

Q       Have you had any work since then?

A       No.

Q       A year later in January of 2008, the medical records show that you started getting prescriptions for some medicines that you hadn't been taking before - - and that's in Exhibit - - let's see - 14E - - and they include some of the medicines that you were talking about with your attorney.  Have you had a chance to take a look at that exhibit as counsel has shown it to you?

A       Yes, ma'am.

Q       Okay.  Was there something that happened in January of 2008 that caused you to go to the clinic and ask for medication prescriptions, do you remember?

A       Other than the pain in my back, it got, you know - - worsened.

Q       And why, in your opinion, did it worsen in January of 2008?

A       Because of the lifting that I did before that.  I had a very busy work schedule with patients that were well over 300 pounds and I did have several of them in the two weeks prior to that.  I was loaded up pretty good with work - -

Q       Okay.

A       - - and I hurt myself pretty good there.  I believe that's what caused that.

Q       Okay.  Well, let me ask you this.  It looks like Amitriptyline and Tramadol were first subscribed for you in January of 2008, which was about five months ago.  You stopped working as a certified nurse's assistant almost 17 months ago.

A       Um-hum.

Q       So between January of '07 and January of '08, you were not taking these medications, according to the record.  Does that make sense to you?

A       Yes, I suppose, yes.

Q       Do you recall, if, if you do, what, what happened, if anything, that caused you to go into the Belington Clinic in January of 2008 and getting prescribed these new medications?

A       Well, I did have a loss of a parent in, in June, which I think might have attributed to the Amitriptyline because I wasn't sleeping.  I hadn't slept since June the 16th 2007, and then my back forced  - - you know, the pain in my back - - that's why I got the Tramadol.

Q       And when you say a loss of a parent, was that your mom?

A       Yes, it was.

Q       So she died in June of 2007?

A       Yes, ma'am.

Q       There was also a new medication subscribed in January of 2008 by the Belington Clinic, Avadamet (Phonetic).

A       Avandament (Phonetic).

Q       Thank you.

A       That's from - -

Q       Is that for your diabetes?

A       Yes, ma'am.

Q       In terms of the Tramadol prescription for your low back, it says in Exhibit 14E that you're prescribed two per day, does that sound right?

A       I'm prescribed four a day.

ATTY   Your Honor, that's my error.  I, I wrote down a two a day when he takes two tablets twice a day.

CLMT   Twice a day.

ALJ    Thank you, Counsel.

ATTY   I'm sorry Your Honor.

BY ADMINISTRATIVE LAW JUDGE:

Q  And do you take them on a regular schedule or only as needed?

A  Yes, ma'am, regular schedule.

Q  When would that be?

A  First thing in the morning, 6:15-6:30, and then again at 6:30 in the evening.

Q  As part of your daily living activities since you live alone, who takes care of your personal needs in terms of bathing, dressing, hygiene?

A  I do.

Q  Have any difficulties with those things?

A  No.

Q  After you visit with your grandmother for three or four hours in the morning, what do you do?

A  I usually just go back to the house and sit and watch television.

Q  Do you have any difficulty watching television?

A  No, I have to get up and down, you know, besides just setting still.

Q  In terms of the Amitriptyline that you're taking for depression, are you also seeing a counselor or therapist, a psychiatrist?

A  No, ma'am.

Q  So that's just something that's been prescribed with the assistance of the physician's assistant?

A  Yes.

Q  Thank you.  In addition to the medications that you've been taking, can you identify, if anything, any other measures that you're taking or do take to alleviate your symptoms of pain?

A  Yes, I do take ibuprofen 800, probably 800 milligrams morning and I usually do that again of an evening.

Q  And I take it you are taking that at the same time or at a similar time as when you take the Tramadol?

A  Yes, ma'am.

Q  And when you take the Flexeril is that something that you take as needed or on a structured basis?

A  As needed.

Q  On a typical day, how often do you take that?

A  Twice.

Q  And when would that be?

A  It just all depends.  There's no - -

Q  No structure?

A  - - no, no set, you know, just all depends.

Q  When, when you take it is it because you're having some pain?

A      Yes.

Q      And what kind of pain causes you to take the Flexeril?

A      It tightens. My back tightens and it just feels like someone's pulling your backwards with a knee in the middle of your back is what it feels like it.

Q      Okay. You had indicated at some point in February of 2007 that you had prescribed 15-pound weight restriction. Do you remember that at all?

A      Yes.

Q      Do you recall who, if anyone had prescribed that weight restriction?

A      Dr. Weinstein.

ALJ      Mr. Miskowiec, I have no further questions. Do you have any follow up?

ATTY      Yes, ma'am, just a couple. Now prior to your taking Advandament - -

CLMT      Um-hum.

Q      - - in - - well, let's start with Advandament. Were you taking Avandia at one time?

A      Yes, I was.

Q      And did they take you off that medicine?

A      Yes, they did - -

Q      At the Belington Clinic? Did they tell you why?

A      No.

Q      Did they start you on Avandament after that?

A      Yes.

Q      Okay. And at one time were you taking Glyburide?

A      Yes, sir.

Q      Yes.

Q      Did they put you on Limiperide (Phonetic) after that?

A      Yeah, yes.

Q      Okay. So you were on diabetes medicine, it was just different?

A      Right.

Q      Okay.

A      And also the Humalog, I used to take Humalog instead of (INAUDIBLE) insulin.

ALJ      I'm sorry, Counsel I do have another question.

BY ATTORNEY:

Q      Mr. Wetmore, it sounds like you've had diabetes for at least 10 years.

A      Yes, ma'am.

Q      And can you tell us if you've had a weight issue for as long a time?

A      Yes, ma'am.

Q      So this has been a long constant - -

A      Yes, ma'am.

ALJ      Counsel, since the Court inquired, do you have any further inquiry?

ATTY      I just had one more question, Your Honor.

RE-EXAMINATION OF CLAIMANT BY ATTORNEY:

Q      You were telling the Judge about the doctors you see at the Belington Clinic and you mentioned Dr. Savage had left. Now Dr. Harris is there, but when you testified before you also talked about a Dr. Henderson.

| | |
|---|---|
| A | Yes. |
| Q | Is he still there? |
| A | Yes. |
| Q | Does he run the clinic? |
| A | I believe he does, yes. |
| Q | Okay, so he was there when Dr. Savage was there? |
| A | Yes. |
| ATTY | Nothing further, Your Honor. |
| ALJ | Thank you. |

*          *          *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q     Could you identify Mr. Wetmore's past relevant work and we'll start with the work as actually performed by him over the last 15 years?

A     His work as a CNA would be medium and semiskilled and his work as parts manager in the audio industry there would be normally performed light and skilled, but the lifting requirements swing it up into the heavy range, probably at different intervals be depending on the customer demands of that particular day.

Q     Well, let's talk about how the work was actually performed by the claimant. What was the skill level as he testified to it or the certified nurse's assistant, in your opinion?

A     Medium and semi-skilled.

Q     Would - - and then for the parts manager, as actually performed, would be the exertional level and skill level.

A     The - - that would be heavy and skilled.

Q     Would that be the same if the - - as customarily performed in the national economy?

A     Yes, I believe it would.

Q     Mr. Wetmore indicated that he was a lead worker when he worked at the auto parts store and also supervised three years. Would that, that kind of skilled work translate to be transferable to other work in your opinion?

A     No, that's pretty job-specific and I do not believe it would transfer to sedentary.

*          *          *

Q     I'm going to ask you, Mr. Bell, to assume the claimant has the residual functional capacity to perform a range of light exertional work with occasional postural and environmental limitations as outlined by Jim King in his March 8, 2007 physical RFC report, which is marked as Exhibit 12E clarified and affirmed by the lower level office on March 28, 2007, which is exhibit 9F, and confirmed by a medical physician in Exhibit 5F. And those exertional postural and environmental capacities are as follows. To lift and carry 20 pounds occasionally, 10 pounds frequently, sit, stand and walk up to 6 hours in an 8-hour workday, to occasionally balance, stoop, kneel, crouch and crawl, and I'll note that the balancing should be considered to be on uneven ground, to occasionally climb rope, ramps and stairs, to have no climbing of ladders, ropes and scaffolds, and to avoid environmental conditions such as concentrated extreme heat and cold temperatures, vibrations, and/or hazards. With, with that type of hypothetical, which I'm going to identify as hypothetical number one, would Mr. Wetmore be able to perform any of his past relevant work as he actually performed the work?

21

A     No, Your Honor.

Q     Then going to hypothetical number two, assuming the same RFC, would Mr. Wetmore be able to perform any of his past relevant work as it's generally performed in the regional or national economy?

A     No, Your Honor.

Q     Why not?

A     Well, the - - first of all, the CNA is at the medium level, and the salesperson, as normally performed is, is also above that light restriction that you gave me.

Q     And in, in forming your response, what region are you utilizing in answering the question?

A     West Virginia, Eastern Ohio, western Maryland and western Pennsylvania.

Q     Let's then go to a third hypothetical.  Assume an individual has Mr. Wetmore's age, education and work history and background.  And then also assume - - excuse me - - that this individual has the capacity to perform work with the same prior RFC with light exertional limitations, postural and environmental limitations.  Are there any unskilled occupations this type of individual could perform in the regional or national economy?

A     Yes, Your Honor.  The hypothetical individual at the light level, I believe, could function as an assembler.  Total number available nationally is at 950,000, 6,200 regionally, or as a - - an office assistant, 150,000 nationally, 1,850 regionally.

                    *                    *                    *

Q     Thank you.  Let's assume a fourth hypothetical and assume the same light-duty RFC with the - - as previously identified, but add the following restrictions.  For exertional, that this person would need a sit/stand option with the need to change positions at intervals not to exceed 20 to 25 minutes throughout the course of an 8-hour workday, or additional postural limitations, no squatting, kneeling or crawling.  Would there be any unskilled occupations such a person could perform?

A     I would give a reduction in both of those categories, Your Honor.  I would reduce the assembler by one-third and the office assistant by one-fourth, but the, the - - that wouldn't, that wouldn't eliminate either one of those though.

Q     And are, are there jobs of assembler and office assistant exclusive or are they just samplings of jobs that might be available?

A     Those are samplings, Your Honor.

Q     Let's go to a fifth hypothetical then and assume the same RFC information and limitations as in hypothetical number four, which we just finished.  But also add the following additional imitations, that the individual's able to lift a maximum of 15 pounds occasionally, 10 pounds frequently, can't stoop at all, and should be required to perform only simple, say, one-to three-step types of tasks because of some troubles with drowsiness and trouble concentrating.  Based on that fifth hypothetical, would there be any unskilled occupation such a person could perform?

A     That would reduce it to sedentary, Your Honor.

Q     And why is that?

A     The maximum lifting is only 15 pounds.

Q     Well, sedentary would require a maximum of 10 pounds, and 15 pounds is above that, so I - -

A     But 20 for light though, it's - - maximum is 20 pounds.

Q     Right, the maximum for light-duty would be 20 pounds and I'm trying to ask you to assume a hypothetical that gives a, a reduction of light-duty work but that's above sedentary level.  Does that make sense?

A     Yes, it does.  I'm just, I'm just thinking the maximum - -

Q     Yes, I know.

A     - - range.  I wasn't, I wasn't quite following you.  I would give a further reduction in, in both of those categories, 50 percent for the assembler and a third for the office assistant.

Q     But there are still jobs available?

A     Yes.

Q     Well, let's try a, a sixth hypothetical, and then let's assume that this individual has Mr. Wetmore's age, education, work history and background, and also assume that this individual has the residual functional capacity to perform a full range of sedentary work, which would be lifting and carrying a maximum of 10 pounds, sitting up to six hours in an eight-hour workday, standing  and walking no more than two hours in an eight-hour workday, for postural occasional balancing on uneven ground, stooping, kneeling, crouching and crawling, occasional climbing ramps and stairs, no climbing ladders, ropes and scaffolds, and environmental, avoiding concentrated heat and cold temperatures, vibrations and/or hazards.  With that type of sedentary RFC, would there be any unskilled occupations such a person could perform?

A     Yes, Your Honor, at the sedentary level, general sorter, sedentary, 50,000 nationally, 650 regionally, or machine tender, 141,000 nationally, 1,400 regionally.

\*        \*        \*

Q     Let me give you a seventh and last hypothetical.  Let's assume the same sedentary RFC information and limitations as stated in hypothetical number six, but with the following additional restrictions, that there's a sit/stand option provided for every 30 minutes, that there is no stooping, kneeling, crouching, crawling, and that the individual should only be able to perform, or be given one- to three-step simple tasks.  Would there be any unskilled occupations such a person could perform?

A     I believe those two occupations that I had given you previously at sedentary would stand, Your Honor.

\*        \*        \*

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q     Mr. Bell, going back to the fifth hypothetical and I can give you the details if you want.

A     I've got it.

Q     All right.  That was the one in which you further reduced the assembler job by 50 percent and the office assistant by a third.  Just for clarification of the record, does that mean we are now down to 15 percent of the assembler jobs total?

A     No, I, I, I changed it from - - I, I reduced the first one by a third, and then by - - number five it went up to a half.

Q     So there were actually more jobs available in assembler in number five than in number four?

A     No, if you have one-third off the first time and one-half off the second - -

Q     Oh, okay.  So 66 percent of the assembler jobs are available in response to

hypothetical number four?

    A      That's correct.

    Q      50 percent of the assembler jobs are available in number five?

    A      That's correct.

    Q      Is that what you're telling us?

    A      Yes.

    Q      Okay.  All right.  Now did you reduce the numbers on the two jobs you identified in response to number seven?

    A      No.

    Q      And they're fully available?

    A      Yes.

    Q      When the Judge gave you a sit/stand option of a duration of 20 to 25 minutes in one hypothetical and 30 in another, did you assume the individual would be able to stand, if needed, up to that period?

    A      Yes.

    Q      If we were to indicate that he could only stand for 10 minutes, he can sit for the 20 to 25 or 30, but he can only stand for 10, would that change your answer to either of the hypothetical questions?

    A      That would further limit the light.  It wouldn't change my sedentary answer.

    Q      How would it limit the light - - and I assume that's number five you're talking about?

    A      Yes.  Would you say that again?

    Q      He can stand for 10 minutes at a time.  That's the longest he can stand.  He can sit for 20 to 25 or 30 depending on - -

    A      Okay.  I believe that's going to eliminate light.

    Q      That's going to put him in the sedentary category?

    A      Yes.

    Q      Now if an individual is, is, is limited to a full range of sedentary except they cannot stoop at all, is it your testimony that they would be able to perform jobs in significant numbers in the national economy?

    A      At the sedentary level I don't believe stooping would be an essential part of that job.

    Q      Now how many days would an individual be able to miss in response to the two jobs you've given, basically, office assistant and assembler?

    A      Okay, if, if a person's going to miss two, two or more days per month, I believe that the supervisory personnel would attempt an intervention.  And if that was not remedied then it would result in termination fairly quickly.

    Q      So, but if it happened consistently more than one, one month - -

    A      I don't think it would take too long.  I think - - that would depend on some degree on the site.  He might have one site that's a little more flexible, but I don't believe it would take too long.

    Q      If an individual suffers drowsiness from their pain medication such that there's unable to perform even simple work for a period of an hour during the workday, would that change your answer to any of the questions you've been asked?

A        I don't believe that would allow for them to be on task enough to complete a competitive work routine.

ATTY        Your Honor, I don't have any further questions for Mr. Bell.

ALJ        Thank you, Mr. Miskowiec.

RE-EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q        Mr. Bell, I have one further question for you.  Counsel asked you about some limitations of a sit/stand option.  Let's assume for a final hypothetical that - - we're looking a hypothetical number five again, which was - - which had originally indicated a sit/stand option of 20 to 25 minutes throughout the course of an 8-hour workday.  Let's change that and say that it's a sit/stand option where the individual can stand for 15 minutes and sit from 30 to 40 minutes at a time.

A        Your Honor, you would be referring to number six, right, because number five did not have a - - oh, yeah, I'm sorry, number five did have a sit/stand.  I'm sorry.  I was, was referring back to four.

Q        Yes.

A        (INAUDIBLE)

Q        Right.

A        That would - - and your question is?

Q        If we change the sit/stand option to be further limiting instead of having a sit/stand option not to - - with intervals not to exceed 20 to 25 minutes, if we had a sit/stand option that would allow the individual to sit for 30 to 40 minutes at a time, then stand up to 15 minutes at a time before changing positions, would that change your opinion in any way?

A        That would eliminate light.  That would be best-suited for sedentary, your Honor.

Q        If we had a sedentary hypothetical such as hypothetical number six, where the individual was able to perform a full range of sedentary work with the postural and environmental limitations that were previously provided but with a sit/stand option where the individual could sit after 15 minutes of standing or stand after 30 to 40 minutes of sitting, would that change or eliminate jobs?

A        No, that would not at sedentary.

Q        I'm sorry?

A        That would not eliminate the sedentary.

Q        Would there be a reduction of jobs in hypothetical - - in this hypothetical from the ones you provided in hypothetical number six?

A        No, because that was at sedentary.  That wouldn't eliminate those jobs.

Q        I'm sorry?

A        That would not eliminate those jobs - -

Q        Okay.

A        - - that I had given to you.

ATTY        Your Honor, for the record, I'd note that that answer is not responsive. You asked if there would be a reduction.

ALJ        Thank you.

BY ADMINISTRATIVE LAW JUDGE:

Q        Mr. Bell, I may not have asked this very clearly, and I know it's hard to track, so maybe what I'll do is I'll ask you a final hypothetical with all of the provisions without referring

you back to, to different hypotheticals. This would be the court's hypothetical number eight - - I'm sorry - - the court's hypothetical, all, all listed as hypothetical number nine. Let's assume that an individual with Mr. Wetmore's age, education, work history and background and that this individual has the residual functional capacity to perform a full range of sedentary work, that is, lifting and carrying a maximum of 10 pounds, standing and walking a maximum of 2 hours in an 8-hour workday, sitting up to 6 hours in an 8-hour workday, occasional balancing on uneven ground, occasional stooping, kneeling, crouching, crawling, occasional climbing ramps and stairs, no climbing of ladders, ropes and scaffolds, and avoiding concentrated and extreme heat and cold temperatures, vibrations and other hazards. And add to that the additional limitations of a sit/stand option where the individual could sit for up to 30 to 40 minutes at a time and stand for up to 15 minutes at a time before changing positions. The individual would also be assigned simple one-to three-step tasks. Would there be any unskilled jobs that person could perform?

        A        I believe the two jobs that I've given you would allow for that, Your Honor. I - -

        Q        And when you say the two jobs, are you talking about the general sorter and the machine tender?

        A        Yes.

        Q        Would there be any reduction in those jobs because of the additional restrictions that I provided in hypothetical number nine?

        A        Just to be on the safe side, I would reduce them by a quarter.


E.      <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and

through medical records. The information is included in the report to demonstrate how

Claimant's alleged impairments affect his daily life:

- is able to drive and drives everyday (Tr. 34, 52-53, 170)
- washes dishes once per day without a break (Tr. 41)
- has assistance in handling household chores (Tr. 42)
- is unable to do laundry (Tr. 42)
- is unable to make his bed (Tr. 43)
- is able to go grocery shopping (Tr. 43, 170)
- is able to fix his own meals daily (Tr. 39, 44, 169)
- has assistance unloading groceries (Tr. 47)
- is able to sit for 30-40 minutes before needing to stand (Tr. 50)
- is able to walk 100 yards before needed to sit (Tr. 50)
- has trouble sleeping (Tr. 53, 168)
- is able to take care of his personal needs such as bathing, dressing, and hygiene (Tr. 61)
- has no trouble watching television (Tr. 61)
- cared for mother (Tr. 168)

- has trouble putting on socks (Tr. 168)
- has trouble going to the bathroom (Tr. 168)
- able to complete indoors household chores (Tr. 169)
- goes outside everyday (Tr. 170)
- is able to pay bills, count change, handle a savings account, and use a checkbook (Tr. 170)
- still enjoys hunting, fishing, and shooting weapons (Tr. 171)
- spends time with others (Tr. 171)
- is able to follow written and spoken instructions (Tr. 172)
- handles stress and changes in routine well (Tr. 173)
- is morbidly obese (Tr. 203)

## III. The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant argues that the ALJ's finding that Claimant did not suffer from an impairment that met or equaled §1.04 of the listings is not supported by substantial evidence. Further, Claimant argues that the ALJ erred by finding that Claimant's statements concerning the intensity, persistence, and limiting effect of his symptoms and side effects of his medications were not credible to the extent that they were inconsistent with the ALJ's finding that Claimant could perform a limited range of light work.

Commissioner contends that substantial evidence supports the ALJ's decision that Claimant's lumbar impairments did not meet the exacting criteria for §1.04 of the listings. Additionally, Commissioner contends that the ALJ correctly and reasonably evaluated Claimant's credibility.

B.      Discussion

I.      Whether Substantial Evidence Supports a Finding that Claimant did not Suffer from an Impairment that Met or Equaled §1.04 of the Listings.

Claimant argues that the ALJ's decision is not supported by substantial evidence because the ALJ erred in finding that Claimant did not suffer from an impairment that met or equaled

§1.04 of the listings.  Claimant alleges that the ALJ failed to consider the musculoskeletal

condition that caused Claimant to be disabled: spinal stenosis.  Rather, Claimant alleges that, in

her determination of Claimant's severe impairments, the ALJ listed only degenerative lumbar

disc disease, diabetes, and obesity.  Further, Claimant alleges that in determining that Claimant's

back impairment did not meet §1.04, the ALJ erroneously found that the objective medical

evidence did not show compromise of any nerve root or the spinal cord in the lumbar spine or

appropriate evidence of nerve root compromise.  Commissioner contends that there is no

evidence of the extreme medical conditions necessary to meet the criteria for the listing.

Specifically, Commissioner argues that an MRI taken shortly after Plaintiff's back injury showed

a well-aligned lumbar spine, with only tiny focal herniation; Dr. Weinstein recommended

Claimant seek light-duty work despite his comment about significant pressure on the spinal

nerve roots; and Claimant's straight-leg raising improved from 60 degrees in January 2007 to 90

degrees in January 2008. (Comm. Br. 7).

"For a claimant to show that his impairment matches a listing, it must meet *all* of the

specified medical criteria.  An impairment that manifests only some of those criteria, no matter

how severely, does not qualify."  Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  To meet §1.04,

the Claimant must have a spine disorder, i.e., spinal stenosis, degenerative disc disease, etc.

accompanied by: 1) evidence of nerve root compression characterized by neuro-anatomic

distribution of pain, 2) limitation of motion of the spine, 3) motor loss (atrophy with associated

muscle weakness or muscle weakness), and 4) if there is involvement of the lower back, positive

straight-leg raising test (sitting and supine).  20 C.F.R. pt. 404, Subpt. P, App. 1., Listing 1.04A.

Listing 1.04 also sets forth instructions for evaluating whether a claimant has an impairment or

combination of impairments that meets or medically equals the Listing.

The Listing first defines the loss of function in the musculoskeletal system as "the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. The inability . . . must have lasted, or be expected to last, for at least 12 months." §1.04(B)(2)(a). The inability to ambulate effectively is further defined as "an extreme limitation of the ability to walk; i.e., an impairment that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." §1.04(B)(2)(b)(1). Individuals who have the ability to sustain a "reasonable walking pace over a sufficient distance to be able to carry out activities of daily living," "travel without companion assistance to and from a place of employment or school," and "walk independently about one's home without the use of assistive devices" have the ability to ambulate effectively. §1.04(B)(2)(b)(2).

To assist the ALJ in determining the level of impairment of the musculoskeletal system, the Listing sets forth various instructions and considerations, including the pain and symptoms of the claimant and the documentation of medical treatment. Additionally, the Listing instructs the ALJ to consider additional and cumulative effects of obese individuals with musculoskeletal impairments.

The ALJ found that objective medical evidence of record did "not show compromise of any nerve root or the spinal cord in the lumbar spine, appropriate evidence of nerve root compression, or pseudoclaudication resulting in an inability to ambulate effectively necessary to

meet or medically equal the criteria of Listing 1.04, even when considering the claimant's obesity."

The ALJ's decision is supported by substantial evidence. Claimant does not ambulate ineffectively, as described in the Listing; on the contrary, Claimant testified that he is able to drive (Tr. 52-53), wash dishes (Tr. 41), go grocery shopping (Tr. 43), prepare meals (Tr. 39, 44), walk 100 yards before needing to rest (Tr. 50), and take care of his personal needs (Tr. 61). Claimant does not use a motor devise for ambulatory assistance. Additionally, the ALJ cites several objective medical records indicating that Claimant does not meet the criteria for Listing 1.04. A report dated December 15, 2006, indicates Claimant's lumbar spine is well-aligned, and Claimant was diagnosed with tiny focal herniation with moderate spinal stenosis. (Tr. 216). A report dated February 7, 2007, indicates no significant impress or stenosis at L1-2, a mild degree of spinal stenosis at L3-4, possible minimal herniation and relative spinal stenosis at L4-5, and no significant stenosis at L5-S1 with the most significant finding being severe spinal stenosis at L2-3. (Tr. 217-19). Similarly, two letters, one dated February 12, 2007, from Dr. Weinstein to Dr. Henderson, and one dated February 12, 2007, from Dr. Weinstein to Claimant, indicate only definite stenosis at the 2-3 level. (Tr. 220-22). However, in the letter from Dr. Weinstein to Claimant, Dr. Weinstein also indicates that Claimant "will have to have at worse, light duty at your job if such is available." (Tr. 221).

In no medical record is there any indication that Claimant meets all four criteria of Listing 1.04. Therefore, there was substantial evidence for the ALJ to find that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, 1.

II.     Whether Substantial Evidence Existed to Support the ALJ's Decision to Discredit
        Claimant's Complaints Concerning the Intensity, Persistence, and Limiting Effects of his
        Symptoms and Side Effects of his Medications.

Claimant argues that the ALJ's credibility finding is not supported by substantial

evidence because she did not analyze Claimant's testimony in accordance with applicable legal

standards.  Commissioner contends that the ALJ reasonably determined that Claimant's

impairments, although severe, were not of the same level of intensity, persistence, and limiting

effects as Claimant alleged.

This Court's review of the ALJ's decision is limited to determining whether the decision

is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3).  "Substantial evidence"

is "more than a mere scintilla of evidence but may be somewhat less than a preponderance."

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  "Substantial evidence" is not a "large or

considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'"  Pierce v. Underwood, 487 U.S. 552, 664-65

(1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971).  The decision before the Court

is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is

supported by substantial evidence."  Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005)

(citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)).  The ALJ's decision must be upheld if

it is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3).

Claimant argues that the ALJ's credibility finding is not supported by substantial

evidence because the ALJ did not analyze Claimant's testimony in accordance with the legal

standards required by Social Security policy and Fourth Circuit precedent.  Claimant relies

primarily on the ALJ's observations that Claimant's medical treatment was motivated by

secondary gain.  Claimant alleges that the ALJ ignored several facts in coming to this observation and relies on Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006), in arguing that Claimant was entitled to rely exclusively on subjective evidence to prove that his pain prevented him from working a full workday.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).  Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged.  Id. at 594.  The ALJ must next "expressly consider" whether a claimant has such an impairment.  Id. at 596.  If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled.  Id. at 595.  While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged.  Id.


"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference."  See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997).  "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'"  Powers

<u>v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000) (citing <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990)).

Claimant concedes that the ALJ found, consistent with <u>Craig</u>, that Claimant suffered from a medically determinable impairment that could reasonably cause the symptoms alleged. (Pl. Br. at 10; Tr. 16). However, Claimant erroneously suggests that, once a medically determinable impairment that could reasonably cause the symptoms alleged is identified, he is entitled to rely exclusively on subjective evidence. Though the Court in <u>Hines</u> found that the claimant was entitled to rely exclusively on subjective evidence, the Court noted that:

> While objective evidence is not mandatory at the second step of the test, [t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, *they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment*, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d, at 565 (emphasis added) (citing <u>Craig v. Chater</u>, 76 F.3d 585, 595 (4th Cir. 1996). Therefore, claimants are not automatically entitled to rely exclusively on subjective evidence to show that they are unable to perform work eight hours per day, five days per week. Additionally, the claimant in <u>Hines</u> suffered from sickle cell anemia. As the Court noted, sickle cell anemia "is particularly insidious because it rarely produces the objective medical evidence that clinicians desire. . . there is no way to demonstrate objectively that a SCD patient has pain . . . ." <u>Id</u>. at 561. "Given the unique characteristics of the disease at issue in this case," the Court held that the ALJ erred. Unlike the claimant in <u>Hines</u>, Claimant is not suffering from a disease that rarely produces objective medical evidence. Therefore, the ALJ is permitted to evaluate the

33

subjective allegations in accordance with the objective medical evidence.

Additionally, Claimant argues that the ALJ erroneously based her finding that Claimant was lying regarding his symptoms on his failure to obtain pain management treatment and his failure to have surgery for weight loss. In so arguing, Claimant relies on <u>SSR 96-7p</u>, <u>Lovejoy v. Heckler</u>, 790 F.2d 1114 (4th Cir. 1986), and <u>SSR 02-1p</u>.

Claimant is correct in his statement that <u>Social Security Ruling 96-7p</u> requires that the ALJ consider whether the claimant can afford treatment for his symptoms when determining whether his actions in not obtaining treatment are consistent with disabling pain. However, <u>SSR 96-7p</u> requires more than that consideration. The purpose of <u>SSR 96-7p</u>

> is to clarify when the evaluation of symptoms, including pain, under 20 C.F.R. 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision.

<u>SSR 96-7p</u>. Specifically, the Ruling emphasizes "the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." <u>Id</u>. In determining the claimant's credibility, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." <u>Id</u>. The Ruling sets forth seven factors, in

addition to the objective medical evidence, for the ALJ to consider when assessing the credibility of the individual's statements about symptoms and their effects:

1.      The individual's daily activities;
2.      The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3.      Factors that precipitate and aggravate the symptoms;
4.      The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5.      Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6.      Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and
7.      Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Id.  Therefore, SSR 96-7p sets forth numerous factors for the ALJ to consider when determining the credibility of the claimant's statements.

Claimant is also correct in his assessment of Lovejoy.  In Lovejoy, the Fourth Circuit held that "a claimant may not be penalized for failing to seek treatment she cannot afford; 'it flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.'" Lovejoy, 790 F.2d, at 1117 (citing Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984)).  However, the Court in Lovejoy also states that it is the court's function "to review the evidence in light of the entire record, taking into account the findings of the ALJ who observed the claimant's condition at the hearing and was in position to evaluate the credibility of her testimony."  Id. at 1116.

Lastly, Claimant relies on SSR 02-1p in support of his argument that the ALJ failed to follow agency policy when she faulted Claimant for failing to lose weight in order to have back surgery.  Claimant argues that the ALJ failed to comply with the instructions contained in the Ruling; however, Claimant neglects to specifically mention the instructions with which the ALJ

failed to comply. SSR 02-1p identifies four ways obesity may be considered in the sequential evaluation process of determining disability. Obesity will be considered in determining whether the individual has a medically determinable impairment; the individual's impairment is severe; the individual's impairment meets or equals the requirements of a listing; and the individual's impairment(s) prevents him/her from doing past relevant work and other work existing in significant numbers in the national economy. SSR 02-1p.

The ALJ did not err in assessing Claimant's credibility. In compliance with SSR 96-7p, the ALJ considered numerous factors in determining the credibility of Claimant's testimony. In her opinion, the ALJ cites objective medical evidence contrary to Claimant's allegations, specifically that "lumbar spine x-rays taken on December 6, 2006, were relatively benign showing only 'mild' disc narrowing at L2-3 with anterior osteophytes, and otherwise normal alignment with no loss of vertebral body height and normal appearing soft tissues" and that "on December 15, 2006, a lumbar MRI also showed slightly more abnormal findings, reporting a 'tiny focal herniation' at L2-3 with 'moderate' spinal stenosis causing moderate impingement of the sac." (Tr. 16). Additionally, the ALJ cites three reports from neurosurgeon James Weinstein, M.D. In his January 18, 2007 report, Dr. Weinstein stated that a review of the lumbar MRI revealed some stenosis at L2-3, and that upon physical examination, Claimant "had a positive straight leg raise at 60 degrees and that his reflexes were absent due to his diabetes." (Tr. 16). In his February 12, 2007 letter, Dr. Weinstein reported that a myelogram CT of the lumbar spine confirmed "a definite stenosis at L2-3 . . . but noted that the claimant was feeling a little better, and again deferred surgery for a weight loss program." (Tr. 16). The ALJ also notes that Dr. Weinstein "reported that surgery could be performed under the present conditions" if

absolutely necessary.  (Tr. 16).  The ALJ also cites Dr. Weinstein's letter dated February 12, 2007, addressed to Claimant which reported Claimant's "continued ability to perform 'light work.'" (Tr. 16).

In addition to the objective medical evidence contained in the three letters signed by Dr. Weinstein, the ALJ cites the lack of consistency in Claimant's back pain complaints (Tr. 17), which is one of the enumerated factors in <u>SSR 96-7p</u>.  The ALJ notes that since February 2007, Claimant "had not sought nor received any treatment for his low back pain from Dr. Henderson according to the medical evidence of record, and did not even report back pain to Dr. Henderson in the last treatment report on August 9, 2007."  Similarly, on September 21, 2007, "the claimant reported that he no longer even had any foot pain, let alone debilitating low back pain, and had no significant abnormal clinical signs noted in the physical examination."  (Tr. 17).  The ALJ also cites a report from a visit dated January 18, 2008, during which Claimant again complains about low back pain "which he had not complained about since August 2007."  (Tr. 17).  The ALJ notes that "the physical examination was relatively benign with the claimant having an improved straight leg test to 90 degrees before complaining of thigh pain (instead of 60 degrees as reported by Dr. Weinstein), and the claimant's weight had also gone down to 348 pounds." (Tr. 17).

Related to the inconsistency of Claimant's back pain complaints, the ALJ cites Claimant's failure to follow through with pain management recommendations, which the ALJ explains as "not consistent with his complaints of debilitating low back pain."  (Tr. 17).  Lastly, the ALJ notes that Claimant's testimony regarding his daily activities is inconsistent with his testimony of significant side effects.  "It is noted that the claimant testified that he could lift two

gallons of milk, which would weigh 17 pounds, being 8.5 pounds per gallon.  The claimant also remains able to engage in a wide range of activities of daily living, which is not consistent with a totally disabled person.  He is able to live alone in a house he owns, takes care of his personal hygiene and grooming, prepares meals, enjoys watching television, drives his car every day to visit his grandmother, and does his own shopping."  (Tr. 18).

Similarly, the ALJ complied with <u>Lovejoy</u> and <u>SSR 02-1p</u>.  <u>Lovejoy</u> does state that it is erroneous to consider the failure to seek treatment as a factor in determining disability when the failure is justified by a lack of funds.  <u>Lovejoy</u>, 790 F.2d, at 1117.  However, the case at bar is distinguishable from <u>Lovejoy</u> in two ways.  First, the claimant in <u>Lovejoy</u> actually testified to not being able to afford treatment.  <u>Id</u>.  Claimant testified that he neither had health insurance nor qualified for Medicaid; however, Claimant never testified to not being able to afford treatment.[6] (Tr. 38-39).  Second, Claimant was never instructed to receive treatment.  <u>SSR 02-1p</u> instructs that "[t]he treatment must be prescribed by a treating source, . . . not simply recommended.  A treating source's statement that an individual 'should' lose weight or has 'been advised' to get more exercise is not prescribed treatment."  The ALJ continually references Claimant's doctors' weight loss *recommendations*.  (Tr. 17).  Therefore, not only did Claimant not testify to an inability to afford treatment, there was no *prescribed* treatment - only a recommendation that Claimant lose weight.

This Court finds that the ALJ had substantial evidence to discredit Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms and the side effects of

---

[6] Claimant testified to having disability insurance income from Yiddum Provent.  (Tr. 38).

his medications.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED** because there was substantial evidence supporting the ALJ's decision to find Claimant did not have an impairment or combination of impairments that meets or medically equals one of the Listings and to discredit Claimant's testimony.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: October 26, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE